ULEN & COMPANY, Appellant, *v.* BANK GOSPODARSTWA KRAJOWEGO (National Economic Bank), Respondent.

Second Department, December 23, 1940.

*Chester Bordeau* [*William J. Killoran* with him on the brief], for the appellant.

*Francis N. Bangs* [*Edwin P. Shattuck* and *Sydney Waldecker* with him on the brief], appearing specially for the respondent and for the Republic of Poland.

CLOSE, J. The action is brought to recover the sum of $219,888, due and unpaid on interest coupons attached to bonds issued by the defendant in the principal amount of $7,519,000. The defendant (hereinafter called " the Bank ") was created in the Republic of Poland in 1924. It claims to be an instrumentality of, and so closely identified with, the Polish government as to be entitled to share the sovereign immunity from suit which would be accorded to that government itself. The defendant and the Polish government both appeared specially in the action and moved to dismiss the complaint and to vacate a warrant of attachment, previously obtained by the plaintiff, for lack of jurisdiction. The Special Term granted the motion, but stayed all proceedings pending the determination of the plaintiff's appeal.

The complaint alleges that the defendant is a foreign corporation, organized under the laws of the Republic of Poland. The defendant denies that it is a corporation under Polish law and describes itself as a " State institution." The nature of the defendant, and its relationship to the government which created it, is to be determined primarily from what appears in its charter. It was chartered by means of a decree of the President of the Republic on May 30, 1924, pursuant to a statute relative to the reform of the currency. Article 1 of the charter provided for the merger of three existing institutions, the Polish National Bank, the State Reconstruction Bank, and the Credit Institution of Galician Cities, into a single bank to be known as " Bank Gospodarstwa Krajowego " (National Economic Bank). The new bank was described as follows in article 3: " The Bank Gospodarstwa Krajowego is a State institution; it is a distinct legal person possessing the right of autonomous legal representation and has the right to use in its seal the coat of arms of the State. The corporate seat of the Bank is the City of Warsaw and the territory of its activity — all the Republic."

Under article 4 the share capital of the Bank was to be fixed by the by-laws in the form of shares owned by the State Treasury, State enterprises, municipalities, and municipal enterprises; but not less than sixty per cent of the shares were to be owned by the State Treasury and State enterprises. The objects of the Bank were stated, in article 5, to be the granting of long-term credits through the issuance of bonds; the support of savings institutions; the reconstruction of devastated lands; and the conduct of all banking activities with particular consideration for the needs of the

State, State enterprises and municipalities. Supreme control of the Bank was vested in the Minister of Finance, who was also authorized to promulgate the by-laws. A subsequent amendment to the charter provided for the allocation of net profits in the following manner: Not less than thirty-five per cent for the establishment of special reserve funds for the Bank's debentures and bonds; not less than twenty per cent for the establishment of a general reserve fund; not more than ten per cent for other purposes provided for in the by-laws; and the remainder to be " put at the disposal of the State Treasury and of municipalities in proportion to their shareholdings." The Bank was declared exempt from certain specified State taxes.

Under the by-laws the Bank was authorized to establish branch offices in Poland and abroad. Express power was given to accept deposits, to grant loans, and to buy or sell bills of exchange, foreign currencies and securities. The Minister of Finance was authorized to appoint a Government Commissioner to supervise all the activities of the Bank.

In 1925 the defendant entered into a trust agreement in the city of New York, with The Chase National Bank as trustee, for the issuance of its bonds in the principal amount of $10,214,000, to be secured by a mortgage on the general obligations of certain municipalities in Poland. The proceeds were to be used for the construction of public works in Polish cities. The loan was declared to be " a direct liability and obligation of the Bank, irrespective of any security provided hereunder, * * *." The Bank was the obligor named in the bonds. The agreement provided that in case of default the trustee might protect and enforce its rights and the rights of the bondholders by judicial proceedings in the Republic of Poland, or in the United States, or elsewhere. By a separate instrument the Republic of Poland guaranteed the payment of both principal and interest. Plaintiff is the owner of $5,637,000 of this issue of bonds. In 1937 the maturity date was extended from 1946 to 1967, and the interest rate was reduced from eight to three per cent. The Republic of Poland consented to the extension and renewed its guaranty.

In 1926 the defendant placed a second issue of bonds with the same trustee in the principal amount of $2,750,000. The agreement was in all essential respects similar to the first. In 1937 there was a similar extension agreement and reduction of the interest rate. The Republic of Poland again guaranteed payment. Plaintiff holds $1,882,000 of these bonds.

On January 3, 1940, with the defendant already in default in the payment of interest on both bond issues, the Polish government

published a notice to the effect that because of the German invasion the payment of interest and sinking fund on all Polish loans must be suspended for the duration of the war. Listed in the notice were thirteen bond issues, including the two involved here. The plaintiff immediately procured its warrant of attachment, served it on a number of New York banks in which the defendant had funds on deposit, and commenced this action.

Before proceeding to the main question presented by the appeal, it will be necessary to dispose of a preliminary point. After the commencement of the action the Polish Ambassador communicated in writing with the Secretary of State of the United States, calling attention to the pending action, asserting that the defendant claimed immunity from suit as an instrumentality of the Republic of Poland, and requesting that the Secretary advise the court of the position taken by the Polish government. The Secretary of State thereupon requested the Attorney-General to instruct the proper United States Attorney to appear before the court at the proper time and present the Polish government's position " without argument or comment on his part other than to state that the statements of the Government of the Republic made in its behalf by the Polish Ambassador at Washington are brought to the attention of the court as a matter of comity between the United States and the Republic of Poland, a sovereign State duly recognized by the United States." The United States Attorney for the Eastern District of New York appeared before the court on the motion to dismiss and submitted a written statement complying literally with these instructions.

It is urged that the action of the State Department amounted to a recognition and allowance of the defendant's claim to immunity by the executive branch of the United States government. If that were a correct interpretation the court would have been obliged, without further inquiry, to accept the claim of immunity and decline jurisdiction. (*Compania Espanola* v. *Navemar*, 303 U. S. 68.) It is quite plain, however, that the State Department did not undertake to recognize the claim as valid or to influence the action of the court. It took a position of courteous neutrality. This left the court free to determine the question of jurisdiction, uninstructed by the executive branch of the government. (*Lamont* v. *Travelers Ins. Co.*, 281 N. Y. 362; *Hannes* v. *Kingdom of Roumania Monopolies Institute*, 260 App. Div. 189.) The question is before us on the merits.

It is well recognized as a basic principle of general application that in the courts of this country both our own government and the governments of friendly foreign nations are immune from suit.

The immunity of the domestic sovereign is based on the historic principle that no court has power to command the King. (*The Parlement Belge*, 5 P. D. [1880] 197.) The immunity of the foreign sovereign rests on a somewhat different theory. It is founded on an implied consent on the part of all sovereigns, as a matter of comity, to a relaxation of the complete jurisdiction which each naturally enjoys within his own territory. (*Schooner Exchange* v. *M'Faddon*, 11 U. S. [7 Cranch] 116, 136.) Theoretically, therefore, the immunity of the domestic sovereign is a matter of right, while that of the foreign sovereign is a matter of favor granted voluntarily by the domestic government. But since the favor is reciprocal, the one immunity is, in practice, as obligatory upon the judicial branch as the other. In determining how far the immunity extends beyond the immediate person of the sovereign, authorities dealing with the creatures of the domestic and of foreign governments would seem to be equally applicable.

Reference may first be made to cases involving instrumentalities created by our own government. An early and leading case is *Bank of United States* v. *Planters' Bank* (22 U. S. [9 Wheat.] 904, 907). There the question was whether the defendant bank was subject to suit in the Federal courts, in view of the fact that one of its stockholders was the State of Georgia. It was held that " when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen."

In *Sloan Shipyards* v. *U. S. Fleet Corp.* (258 U. S. 549, 566, 567), Congress had authorized the United States Shipping Board to form the Emergency Fleet Corporation and to purchase not less than a majority of its stock. Sweeping powers, particularly of eminent domain, were given to the corporation by acts of Congress and executive order. The defendant claimed immunity from suit. The court held, however, that it was not entitled to immunity, even though it might be an instrumentality or agent of the government, and that " such a notion is a very dangerous departure from one of the first principles of our system of law; " the principle being that " any person within the jurisdiction always is amenable to the law."

In *Keifer & Keifer* v. *R. F. C.* (306 U. S. 381, 388) the conclusion was the same. The question was whether Regional Agricultural Credit Corporations, formed under authority of Congress by the Reconstruction Finance Corporation, were entitled to governmental immunity. It was held that " the government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work; " and that such cor-

porations would be subject to suit "even if the conventional to-sue-and-be-sued clause were omitted" from the statutes creating them.

The respondent relies on *U. S. Grain Corp.* v. *Phillips* (261 U. S. 106). But no question of immunity was involved in that case. Plaintiff, a United States naval officer, sued for a percentage of a cargo of gold transported in his ship for delivery to the defendant. Under Federal law the commanding officer of a naval vessel was entitled to such compensation for the transportation of gold, unless the owner was the United States government, in which case the officer was required to carry the cargo without charge as a part of his official duties. The gold carried in the plaintiff's ship was the property of the United States Grain Corporation, an organization formed pursuant to presidential order, in which all the shares of stock were owned by the United States. It was held that although legal title to the gold was in the corporation, the government was the actual owner and the plaintiff was not entitled to compensation. The opinion indicates that the case was one in which the court found it necessary to disregard the corporate form in order to prevent unjust enrichment of the plaintiff at public expense. It was not suggested that the corporate identity of the defendant would have been ignored under other circumstances. On the contrary, the *Sloan Shipyards* case (*supra*) was cited to show that the separate existence of the corporation otherwise would have been recognized. "But for purposes like the present," said the court (p. 113), "imponderables have weight." And the case having been decided on its own "imponderables," is not an authority for disregarding the distinct personality of the defendant under the very different circumstances of the present case.

There appears to be no decision in either the United States Supreme Court or in the New York Court of Appeals dealing with corporations formed by foreign governments. There are several such cases, however, in the lower Federal courts in which the same conclusion has been reached as in the case of domestic governmental corporations. In *Coale* v. *Societe Co-op. Suisse des Charbons, Basle* (21 F. [2d] 180) the defendant was a corporation formed by the Swiss government for the importation of coal. The charter and by-laws were subject to governmental approval. The government appointed seven of the seventeen directors, and was entitled to all the net profit above six per cent. The plaintiff sued on a contract of sale which had been signed in the defendant's behalf by the Swiss Minister. The defendant claimed immunity. The District Court held that the defendant was not immune from suit and was liable on the contract. A similar conclusion was reached

in *United States* v. *Deutsches Kalisyndikat Gesellschaft* (31 F. [2d] 199) in the case of a corporation formed and controlled by the French government for the purpose of exploiting potash mines in Alsace. It was held that a " suit against a corporation is not a suit against a government merely because it has been incorporated by direction of the government, and is used as a governmental agent, and its stock is owned solely by the government " (p. 202).

We approve the principle of these latter cases and conclude that a corporation organized by either a domestic or foreign government for commercial objects in which the government is interested, does not share the immunity of the sovereign. There is a dispute in the present case as to whether the defendant is a corporation, but it is of no actual importance whether it be called by that name or not. It has all the characteristics of a corporation. For present purposes the most significant fact is that the Bank is described in its own charter as " a distinct legal person." Since it is a person quite distinct from the Polish government, the reasoning employed in the foregoing authorities with respect to corporations applies with equal force to the defendant. This characteristic also distinguishes the present case from certain authorities cited by the defendant. Thus in *Oliver American Trading Co.* v. *Government of U. S. of Mexico* (5 F. [2d] 659), where the plaintiff sued on a contract made with the National Railways of *Mexico*, it appeared that there was no corporation or legal person existent under that name. " National Railways of Mexico " was merely a name for a system of railroads directly owned and controlled by the Mexican government. Accordingly it was held that the foreign government was entitled to prevail in its claim to sovereign immunity. The same feature was present in *Dexter & Carpenter* v. *Kunglig Jarnvagsstyrelsen* (43 F. [2d] 705), which involved the Swedish State Railways; and in *Mason* v. *Intercolonial Railway of Canada* (197 Mass. 349; 83 N. E. 876), where the railroad was owned directly by the King of England.

The defendant contends that the funds attached by the plaintiff are the property of Poland, and that the bonds represent a part of the public debt of Poland. If either proposition were true, the defendant would be immune from suit. (*Lamont* v. *Travelers Ins. Co., supra.*) But this is merely saying in another way that the separate individuality of the defendant should be disregarded, and that the Bank and the Polish government should be considered as one. Because we may not so consider them, we must reject the conclusion suggested. The funds attached are not those of the Polish government, but of the defendant. The bonds are not those of the Polish government, for the defendant is the obligor. There could be no clearer illustration of the separate identity

of the Bank and the government than the fact that the government guaranteed the Bank's obligations.

Having concluded that the defendant is not immune from suit, we do not reach the question of whether immunity was or could be waived by the provisions of the trust agreements.

The order, in so far as appealed from, should be reversed on the law, with ten dollars costs and disbursements, and the motion denied, with ten dollars costs, with leave to defendant to answer within twenty days from the entry of the order hereon.

LAZANSKY, P. J., HAGARTY, CARSWELL and ADEL, JJ., concur.

Order, in so far as appealed from, reversed on the law, with ten dollars costs and disbursements, and motion denied, with ten dollars costs, with leave to defendant to answer within twenty days from the entry of the order hereon.